IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SUFFOLK TECHNOLOGIES LLC, )
    Plaintiff, )
     )
v. ) Case No. 1:12cv625
     )
AOL INC. AND GOOGLE INC. )
    Defendants. )

FILED DEC -7 2012 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

This patent infringement suit presents the increasingly common, but always vexing jurisdictional question whether plaintiff, the assignee of the patent in issue, possesses "all substantial rights"[1] to the patent, such that it has standing to sue putative infringers. More precisely, the question is whether plaintiff Suffolk Technologies, LLC ("Suffolk"), the owner by assignment of the patent in issue, has standing to sue infringers where, as here, the assignment:

(i)    assigns to Suffolk all right, title, and interest in the patent;

(ii)   assigns to Suffolk unfettered power to decide whom to license to practice the patent and the royalty rate to charge;

(iii)  grants-back to the assignor a non-exclusive license to practice the patent;

(iv)  assigns to Suffolk unfettered power to decide whether to sell the patent and to whom to sell the patent;

(v)   assigns to Suffolk the responsibility to maintain the patent;

(vi)  compensates the assignor for the assignment by requiring payment to the assignor a portion of the stream of revenue from licensing, enforcement, or selling the patent; and,

(vii)  does not explicitly address the right to practice the patent.

---

[1] *See, e.g., AsymmetRx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314, 1319 (Fed. Cir. 2009) ("To determine whether an assignment of patent rights was made, we must 'examine whether the agreement transferred all substantial rights' to the patents and 'whether the surrounding circumstances indicated an intent to do so.'") (quoting *Vaupel Textilmaschinen KG v. Meccanica Euro Italia, S.P.A.*, 944 F.2d 870, 874 (Fed. Cir. 1991)).

For the reasons that follow, Suffolk has the requisite standing to sue for infringement because it possesses "all substantial rights" to the patent in issue.

I.[2]

Plaintiff Suffolk, a Delaware limited liability company with a principal place of business in Bridgewater, New Jersey, is a wholly owned subsidiary of Corporate Research Partners, which in turn is a wholly owned subsidiary of IPValue. IPValue was formed in late 2001 by iFormation, a joint venture of Goldman Sachs, General Atlantic Partners, and the Boston Consulting Group.

Defendants, the alleged infringers, are AOL, Inc. ("AOL"), a Delaware corporation with its corporate headquarters in New York, New York, and Google, Inc. ("Google"), a Delaware corporation with its corporate headquarters in Mountain View, California.

In its amended complaint, Suffolk alleges that AOL and Google have infringed U.S. Patent No. 6,082,835 ('835 patent) entitled "Internet Server and Method of Controlling an Internet Server."[3] The '835 patent claims a method of controlling an internet server whereby the server receives a hypertext transfer protocol file request from a web browser with an identification signal and then compares the identification signal with one or more predetermined identification signals, and based on the results of the comparison, a file may be transmitted from the server back to the requesting web browser. Suffolk alleges (i) that since December 3, 2008, when Google was provided written notice regarding the '835 patent, Google has knowingly

---

[2] The facts recited here are derived from the record, which includes discovery conducted by the parties relating to the jurisdictional standing question presented.

[3] By stipulation of partial dismissal, claims of direct infringement of the '835 patent by AOL were dismissed with prejudice and all claims relating to the infringement of U.S. Patent No. 6,334,132 by Google and AOL were dismissed without prejudice. *See Suffolk Tech., LLC v. AOL, Inc.*, No. 1:12cv625 (E.D.Va. Nov. 13, 2012) (stipulation of partial dismissal).

infringed claims of the '835 patent by operating, using, and selling Google's AdSense and AdWords services, and (ii) that since September 18, 2009, when AOL was provided with written notice of the '835 patent, AOL has knowingly indirectly infringed claims of the '835 patent by actively inducing Google to make, use, and sell advertisements generated in a manner covered by the '835 patent.

The history of the '835 patent title is central to the resolution of the standing question presented. The United States Patent and Trademark Office ("PTO") issued the '835 patent on March 11, 1997 to three British Telecommunications, PLC, ("BT") employees—Stuart J. Antcliff, John C. Regnault, and Laurence D. Bradley—who promptly assigned the patent to their employer. BT is a British public limited company that provides telecommunication services in Europe. Thereafter the path of the title to the '835 patent is defined by two assignments: (1) the assignment from BT to IPValue ("BT Assignment") and (2) the assignment from IPValue to Suffolk ("Suffolk Assignment"). On December 12, 2011, BT and IPValue entered into the BT Assignment, which

> assigned and transferred to IPVALUE [BT's] entire right, title and interest in the ['835 patent,][4] including but not limited to all of its rights to sue third parties for patent infringement and to collect royalties under [the '835 patent.]

Section 2.1. This assignment included the right to sue for infringement "based on activities occurring prior to the execution date." *Id.* Notably, this assignment was "absolute and irrevocable." *Id.* The BT Assignment also assigned to IPValue the "sole discretion to determine

---

[4] The BT Assignment transferred title and rights to a number of patents and patent applications, including the '835 patent. Because only the '835 patent is pertinent here, further references to the Assignment will refer only to the '835 patent.

whether to assert or pursue infringement of, or settle infringement claims relating to the ['835 patent, and] to determine whether and to whom to license the ['835 patent.]" Section 2.2.[5]

In addition to assigning to IPValue the sole and complete discretion to license the patent, the BT Assignment also assigned to IPValue the sole right to sell the patent. Specifically, the Assignment provides that "[a]bsent *a sale or assignment* of [the '835 patent] as part of the good faith pursuit of the Business [i.e., exploitation of the patent] no third party shall be entitled to acquire title to or a license in or under [the '835 patent] except as expressly permitted in this Agreement." Section 5.1.4 (emphasis added). Finally, in addition to all right, title, and interest in the '835 patent, the BT Assignment also assigned to IPValue the sole responsibility "for paying any fees, costs and expenses incurred . . . for patent maintenance, patent prosecution or patent enforcement[.]" Section 5.1.2.

As compensation for the BT Assignment, IPValue agreed to pay BT 50% of the "Adjusted Gross Proceeds" derived from exploitation of the '835 patent, except "that, where there is a sale of any [patent] during the first twelve (12) months, [BT] will receive 90% of the Adjusted Gross Proceeds received from such a sale." Sch. B. The "Adjusted Gross Proceeds" are the revenue stream from the exploitation of the patent less certain costs of generating that revenue stream. In other words, as compensation for the assignment, BT receives either 50% of the profits from exploiting the '835 patent or 90% of the profit from the sale of the '835 patent. As a means of preserving adjusted gross proceeds, the BT Assignment restricts IPValue from retaining outside counsel in a contingent fee arrangement, where outside counsel "would be entitled to collect contingent fees of more than 20% of the damages or other revenues received in

---

[5] *See also* § 5.4 ("Seller acknowledges that IPVALUE shall have sole discretion to determine which Person to pursue or not to pursue in conducting the Business.").

any litigation or exploitation of the ['835 patent.]" Section 5.1.1. Finally, IPValue is required to provide quarterly written or telephonic progress updates to BT regarding the exploitation of the '835 patent.

Certain events trigger an "exclusive option to acquire all of IPValue's and [Suffolk's] rights in and to the [patent] for the consideration of [$10.]" Section 5.1.4. The triggering events include: (i) the failure to meet initial performance requirements, (ii) the decision to cease exploiting the patents, (iii) the failure to pay the renewal or maintenance fee on a patent, or (iv) the abandonment of a pending application.

Finally, the BT Assignment grants-back to BT "an irrevocable, world-wide, royalty-free, non-exclusive, non-sublicenseable except for the Seller Group, non-transferable (except as expressly retained herein) right and license . . . to practice the ['835 patent.]" Section 2.4. In addition, IPValue agreed not to sue BT's "downstream customers." Section 2.5.

On December 28, 2011, IPValue and Suffolk entered into the Suffolk Assignment, wherein IPValue transferred to Suffolk the "entire right, title and interest in the ['835 patent.]" Section 2.1. As part of this Assignment, Suffolk agreed to "perform all of the obligations of IPValue under the BT Assignment" and Suffolk was granted the "sole discretion to determine whether to assert or pursue infringement of, or settle infringement claims relating to the ['835 patent, and] to determine whether and to whom to license the ['835 patent.]" Section 2.2. Both assignments were recorded with the PTO.

## II.

Analysis of the standing question presented properly begins with the Patent Act, which provides that "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The Act also provides that "'patentee' includes not only the patentee to whom the

patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). These provisions have been read by the Federal Circuit "to require that a suit for infringement of patent rights ordinarily be brought by a party holding legal title to the patent." *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007) (citing *Sicom Sys., Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005)).[6] The justifications for these standing requirements are threefold. First, the holder of a mere "nonexclusive license suffers no legal injury from infringement" and thus lacks constitutional standing to bring suit. *Ortho Pharmaceutical Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995).[7] Second, these requirements "enable the alleged infringer to respond in one action to all claims of infringement for his act." *Id.* at 1035 (quoting *Ind. Wireless Telegraph Co. v. Radio Corp. of Am.*, 269 U.S. 459, 468 (1926)). Third, the requirement of standing ensures that a fully litigated finding of invalidity of a patent is binding on the party with standing to bring an infringement action based on that patent and thus bars future infringement suits based on that patent. *Cf. id.*

It is well settled that in order to determine whether a party holds title in a patent, a court must look beyond the name of the transfer, as "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891). It is only "if the patentee transfers *all substantial rights* under the patent, [that the transfer] amounts to an assignment and the assignee may be deemed the effective patentee . . .

---

[6] Parties that do not hold "title to the patent have been accorded the right to sue, or 'standing,' only in certain limited circumstances," namely where the plaintiff holds exclusionary rights that amount to less than "all substantial rights" and also joins the patentee as a party. *AsymmetRx*, 582 F.3d at 1318–20 (Fed. Cir. 2009).

[7] *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (setting forth the requirements for Article III standing).

for purposes of [standing.]" *Sicom Sys., Ltd.*, 427 F.3d at 976 (emphasis added). Put simply, for a successor in interest to have standing to sue, the patentee must have conveyed "all substantial rights in the patent to the transferee." *Propat Int'l Corp*, 473 F.3d at 1189; *see Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 (Fed. Cir. 2007).[8]

In order to determine whether "all substantial rights" in the patent have been transferred, a court "must look to the agreement between the parties and analyze the respective rights allocated to each party under that agreement." *Propat*, 473 F.3d at 1189. Although the Federal Circuit has not identified an exhaustive list of rights to examine, it has identified "at least some of the rights that should be examined." *Alfred E. Mann*, 604 F.3d at 1360. These rights include:

(i) "the exclusive right to make, use, and sell products or services under the patent;"

(ii) "the scope of the licensee's right to sublicense;"

(iii) "the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement;"

(iv) "the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee;"

(v) "the duration of the license rights granted to the licensee;"

(vi) "the ability of the licensor to supervise and control the licensee's activities;"

(vii) "the obligation of the licensor to continue paying patent maintenance fees;"

(viii) "the nature of any limits on the licensee's right to assign its interests in the patent;" and,

(ix) "the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor[.]"

*Id.* at 1360–61. In particular, the Federal Circuit has identified two rights as "vitally important" to determining whether an assignment is sufficient to confer "all substantial rights" and hence

---

[8] If a successor in interest "holds less than all substantial rights but sufficient exclusionary rights that it suffers injury in fact, it can sue as a co-party with the legal title holder[, but] [i]f it lacks injury in fact, [it] lacks standing to be a party[.]" *Morrow*, 499 F.3d at 1341.

standing to sue for infringement: (i) the assignee's right to make, use, and sell a product or service under the patent and (ii) assignee's right to bring suit. *See id.* at 1361.

These principles, applied here, point persuasively to the conclusion that Suffolk possesses "all substantial rights" to the '835 patent. First, Suffolk plainly possesses by assignment right to make, use, and sell the invention covered by the '835 patent. This follows from the following facts: First, the BT Assignment makes clear that BT transferred the "entire right, title and interest" in the '835 patent. Although the BT Assignment does not explicitly address whether all right, title and interest includes IPValue practicing the patent, it is nonetheless apparent that IPValue possessed the right to do so, by doing so itself or by licensing a wholly owned subsidiary corporation to do so. The BT Assignment's grant back of a non-exclusive license further supports that the right to practice was transferred. If the right to practice the patent were not part of the bundle of rights BT transferred to IPValue, then BT would have retained that right and would not have needed the grant of a non-exclusive license. Further, it is pellucidly clear that the parties to the BT Assignment, as well as the Suffolk Assignment intended that the assignment transfer to IPValue the right to practice the '835 invention.[9] A modified syllogism helps illustrate this point:

1) <u>Major premise</u> – Standing to sue for patent infringement requires that a party possess "all substantial rights" to the patent, including especially the right to make, use, sell, or otherwise practice the patent. *See AsymmetRx*, 582 F.3d at 1319.

2) <u>Minor premise</u> – The principal purpose of the BT Assignment and the Suffolk Assignment is to transfer to Suffolk the right and responsibility to enforce the patent by suing for infringement, if required.

---

[9] *See Vaupel*, 944 F.2d at 874 ("To determine whether a provision in an agreement constitutes an assignment or a license, one must ascertain the intention of the parties and examine the substance of what was granted."); *see also Sicom Sys.*, 427 F.3d at 979 ("this court has established that the intention of the parties to the Agreement and the substance of what was granted are relevant factors in determining whether all substantial rights in a patent were conveyed").

> 3) <u>Conclusion</u> – Therefore, the parties to the assignments surely must have intended the assignments to transfer to Suffolk all right, title and interest to the '835 patent, including the right to make, use, sell or practice the invention. A contrary conclusion would leave Suffolk without standing to bring infringement suits and thereby defeat the principal purpose of the assignments.

In other words, the parties to the assignments undeniably intended that Suffolk have standing to sue for infringement of the '835 patent and therefore, surely intended that the assignments would transfer to Suffolk all substantial rights to the '835 patent, including the right to practice the patent.

In addition to the right to practice the patent, the BT Assignment and the Suffolk Assignment also make clear that the sole right to sue—or not to sue—for infringement was transferred in whole first to IPValue and then to Suffolk. The BT Assignment states that IPValue "shall have sole discretion to determine whether to assert or pursue infringement of, or settle infringement claims relating to the ['835 patent.]" § 2.2.[10] In turn, the Suffolk Assignment provides that "Suffolk shall have sole discretion to determine whether to assert or pursue infringement of, or settle infringement claims relating to the ['835 patent.]" In other words, the decision as to whether to pursue an infringement claim and whether to settle an infringement claim rests now solely with Suffolk.

Further, the BT and Suffolk Assignments makes clear that Suffolk received the sole right to sell the '835 patent, and, as the Federal Circuit has confirmed, the right "to dispose of an asset is an important incident of ownership." *Propat*, 473 F.3d at 1191. It is clear that IPValue received this right because the BT Assignment specifically permits sales and the fee schedule

---

[10] The BT and Suffolk Assignments also make clear that Suffolk received the right to sue infringers for activity that preceded the Assignments.

– 9 –

specifically provides for a sale, and this right was assigned to Suffolk, which received "IPVALUE's *entire* right, title and interest in the ['835 patent.]" (emphasis added).

In addition to these core patent rights, the bulk of the remaining rights identified by the Federal Circuit were also transferred to Suffolk by way of the BT and Suffolk Assignments. In particular (i) the unfettered right to license the '835 patent and (ii) the responsibility for maintaining the '835 patent were transferred to Suffolk. In addition, the assignment of these rights to Suffolk was either for the duration of the patent or for as long as Suffolk continued to exploit the patent. In other words, the duration of the assignment was as long as the life of the '835 patent.

The four limitations in the BT Assignment—which apply also to the Suffolk Assignment—do not weigh against the finding that "all substantial rights" to the '853 patent were transferred to Suffolk. First, Suffolk is obligated to pay to BT 50% of adjusted gross proceeds earned on the '835 patent to BT. This obligation also represents BT's compensation for assigning the '835 patent to IPValue and is "not inconsistent with an assignment." *Vaupel*, 944 F.2d at 875 (citing *Rude v. Westcott*, 130 U.S. 152, 162–63 (1889) (retaining a portion of "sales, royalties, or settlements, or other sources" does not limit an assignment of a patent)). Second, BT received an exclusive option to buy back the patent if IPValue, and then Suffolk, failed to meet certain revenue goals or if IPValue, and then Suffolk, ceased exploiting or maintaining the '835 patent. Yet it is clear that an assignor "does not retain a substantial right in a patent merely by reserving a reversion in the patent contingent upon the [assignee's] financial distress or the [assignee's] cessation of production[.]" *Speedplay, Inc. v. Bepop, Inc.*, 211 F.3d 1245, 1252 (Fed. Cir. 2000). Third, the BT Assignment requires IPValue to provide, at least once a quarter, a written or telephonic progress update, but a reporting or "inspection provision constitutes a

policing mechanism, not a substantial property right." *Id.* Finally, the BT Assignment prohibits IPValue from retaining outside counsel for infringement suits where such counsel would be entitled to collect contingent fees of more than 20% of damages or other revenues. This provision simply protects BT's compensation for the assignment of the patent by ensuring that the revenue stream derived from the patent is not depleted by extravagant legal fees, which are not uncommon.

Settled Federal Circuit authority, although not precisely on point factually, firmly supports the result reached here. Thus, in *Vaupel*, the Federal Circuit held that a plaintiff assignee held "all substantial rights" in a patent where the assignor retained only,

> 1) a veto right on sublicensing . . . ; 2) the right to obtain patents on the invention in other countries; 3) a reversionary right to the patent in the event of bankruptcy or termination of production ; and 4) a right to receive infringement damages.

944 F.2d at 875. Importantly, as the *Vaupel* court explained, "none of these reserved rights was so substantial as to reduce the transfer to a mere license or indicate an intent not to transfer all substantial rights." *Id.* Further, *Vaupel* noted that the agreement transferred the right to sue for infringement, and "this grant is particularly dispositive here because the ultimate question confronting us is whether Vaupel can bring suit on its own[.]" *Id.*[11] As compared to the assignee in *Vaupel*, Suffolk received far more rights—and BT retained fewer rights—as Suffolk obtained the sole discretion to bring infringement suits and to license the patent.[12] Likewise, in

---

[11] *See also Sicom Sys.*, 427 F.3d at 979 ("We agree . . . that an important substantial right is the exclusive right to sue for patent infringement. . . . This right is substantial because the right to sue is the means by which the patentee exercises the right to exclude others from making using, and selling the claimed invention.") (internal citations and quotation marks omitted).

[12] *See also Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir. 2006) (explaining that the transfer of "(1) the exclusive right to make, use, and sell products covered by the patent; (2) the right to sue for infringement of the patent; and (3) a virtually unrestricted authority to sublicense its rights under the agreement" strongly favor a finding of an assignment,

*Speedplay*, the Federal Circuit held that the plaintiff had standing to sue where the plaintiff was granted

> exclusive worldwide, royalty-free, right and license under and to the Licensed Patents and the exclusive rights and license to manufacture, have manufactured, distribute, market, use and sell the Licensed Product and any other apparatus, instrument, device or product covered in whole or in part by the Licensed Patents.

211 F.3d at 1250. This grant was subject to several restrictions not present here, including (i) requiring consent of the transferors prior to the plaintiff's assignment of interest, and (ii) providing for the transferor's option to bring its own infringement suit if the plaintiff transferee fails to enforce the patent, as well as one restriction present here, and (iii) specifying a right to inspect the plaintiff transferee's books and records regarding the exercise of rights under the agreement. *Id.* at 1251–53. The Federal Circuit explained that these restrictions were not substantial rights because (i) sublicensing consent could not be withheld "unreasonably," (ii) the transferor's right to bring an infringement suit could be rendered "nugatory by granting the alleged infringer a royalty-free sublicense," and (iii) the "inspection provision constitutes a policing mechanism, not a substantial proprietary right." *Id.* Thus, as compared to the plaintiff in *Speedplay*, Suffolk has greater rights in the '835 patent, as Suffolk has sole discretion whether to license or bring suit and BT retained no right to enforce the patent independently.

In sum, BT transferred "all substantial rights" in the '835 patent to IPValue, and IPValue subsequently transferred all of its rights in the '825 patent to Suffolk. In particular, the two core rights identified by the Federal Circuit as "vitally important"[13]—the right to make, use, or sell the service under the patent and the exclusive right to sue for infringement—were transferred

---

but holding that "by having rights for only a limited portion of the patent term, [transferee] simply did not own the patent").

[13] *See Alfred E. Mann*, 604 F.3d at 1361.

from BT to IPValue and thence to Suffolk. Indeed, were Suffolk held not to have standing to sue for infringement of the '835 patent, the assignments would fail of their intended purpose and it is unclear who would have standing to bring this infringement suit, given that BT retained only a non-exclusive license and IPValue transferred all of its right, title, and interest to Suffolk. Nor is there any doubt by possessing "all substantial rights" in the '835 patent, Suffolk suffers an injury-in-fact by defendants alleged infringing activity. *See Morrow*, 499 F.3d at 1339 ("The party holding the exclusionary rights to the patent suffers legal injury in fact under the statute."); *see also Lujan*, 504 U.S. at 560–61.

Google and AOL offer several arguments in support of their contention that Suffolk lacks all substantial rights, but none of these is persuasive. First, Google and AOL argue that Suffolk never acquired the right to make, use, or practice the '835 patent, but instead, received only the right to sue and was prohibited from engaging in any other activity. In support, they cite *E8 Pharmaceuticals LLC v. Affymetrix, Inc.*, 680 F.Supp.2d 292,[14] where the court held that the plaintiff, who was an "exclusive" licensee with the right to grant sublicenses and to bring infringement suits, lacked standing to bring an infringement suit. *Id.* at 295–97. But the facts in *E8 Pharmaceuticals* are poles apart from the facts here. In *E8 Pharmaceuticals*, the plaintiff received only an "exclusive" license from the patent assignee and in order to argue that it had the right to practice the patent, plaintiff argued that it implicitly had the right to sublicense to itself. *Id.* at 296–97. Further, the plaintiff in *E8 Pharmaceuticals* was required to (i) consult with the licensor regarding planned litigation, (ii) obtain written consent from the licensor before settling

---

[14] Defendants also cite *A10 Networks, Inc. v. Brocade Comm. Sys., Inc.*, No. 5:11cv05493, 2012 WL 1932878 (C.D.Cal. May 29, 2012). There are so many redactions in the opinion that it is not possible to determine whether the facts in that case are comparable to the facts presented here. *See, e.g., id.* at *7 ("In addition, [Redacted].").

litigation, and (iii) obtain written consent from the licensor before assigning its interest in the patent. *Id.* at 298–99. These facts are in sharp contrast to the instant case. Unlike the plaintiff in *E8 Pharmaceuticals*, Suffolk is not a licensee, but the assignee of the '835 patent and received "all right, title and interest" in the '835 patent. Put simply, although neither the BT Assignment nor the Suffolk Assignment explicitly address Suffolk or IPValue making, using, selling, or practicing the '835 patent, the assignments neither prohibited nor withheld that right and to the contrary, both assignments explicitly transferred *all* right, title and interest, surely including the right to practice the patent. Further, Suffolk is not required to consult with BT or IPValue concerning whether and whom to sue for infringement, nor is Suffolk required to obtain consent from BT or IPValue prior to settlement of infringement suits, nor to obtain BT or IPValue's consent prior to assigning or selling the patent; instead, Suffolk has *sole discretion* in such matters.[15]

Google and AOL next argue that other courts have held that assignments ostensibly similar to the BT and Suffolk Assignments do not transfer all substantial rights. These cases are inapposite. In *Penril Datacomm Networks, Inc. v. Rockwell Int'l Corp.*, 934 F.Supp. 708 (D.Md. 1996), the court held that the plaintiff lacked standing to sue where, unlike this case, the putative assignor retained the right to license the patent and restricted alienation. *Id.* at 711. The *Penril* court explained that the "critical flaw" in the assignment was the "nonexclusivity of Penril's right to make, use and sell" the patent and, because the plaintiff "has no proprietary interest or

---

[15] The defendants cite § 9.6 of the BT Assignment to argue that neither IPValue, nor Suffolk, has the right to sell the patent without the permission of BT. This argument misunderstands § 9.6, as this section prohibits assignment of the BT Assignment contract, either by BT or by IPValue, without the consent of the other party. This section does not contain, nor contemplate, restrictions on the alienation of the '835 patent, which is one of the patents consistently referred to as "ASSETS" in the BT Assignment.

right to exclude others from making, using or selling the patent[,]" the plaintiff "is thus a 'bare' licensee[.]" *Id.* The assignment in *Penril* bears no resemblance to the assignments here; IPValue, and subsequently Suffolk, was granted the "sole discretion" to grant licenses or to determine whether to sue for infringement. And unlike the plaintiff in *Penril*, there is no restriction on Suffolk's right to sell the patent. Equally inapposite is *Verve, L.L.C. v. Thales E-Transactions, Inc.*, No. Civ. 05-40032, 2006 WL 800754 (E.D. Mich. Mar. 27, 2006), where the court held that because the assignor retained "a right to grant licenses to its customers" and shared the licensing revenue, the plaintiff lacked all substantial rights. *Id.* at *3–*4. In comparison, BT here did not retain a right to grant licenses; instead, the BT Assignment only provides that IPValue, and thereby Suffolk, agreed not to sue BT's "downstream customers." This is not a grant of a licensing authority to BT, but rather protects BT's customers from indirect infringement suits by Suffolk. Further, the *Verve* court's reasoning that sharing the revenue from licensing pertains to all substantial rights is not persuasive and is contrary to Federal Circuit authority. *See Vaupel*, 944 F.2d at 875 (retaining a portion of royalties is "not inconsistent with an assignment" of all substantial rights to a patent). Rather, the use of revenue sharing from the exploitation of the patent is merely a means of compensation for the assignment of the patent. *See id.*

### III.

In sum, the BT Assignment and the Suffolk Assignment have transferred all substantial rights in the '835 patent to Suffolk, which now possesses the core rights to practice the patent and to enforce the patent. In addition, Suffolk possesses all other substantial rights. As a result of the assignments, BT retained only a non-exclusive license to practice the patent and the right

to share in revenue from the exploitation of the patent. Accordingly, Suffolk possesses "all substantial rights"[16] to the '835 patent and thus has standing to maintain this infringement action.

An appropriate Order will issue.

Alexandria, VA
December 7, 2012

_____
T. S. Ellis, III
United States District Judge

---

[16] *See AsymmetRx*, 582 F.3d at 1319.