**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| SUFFOLK TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:12-cv-625-TSE-IDD |
| v. | ) | |
| | ) | JURY TRIAL REQUESTED |
| AOL INC. and GOOGLE INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM IN SUPPORT OF GOOGLE'S**</u>

<u>**MOTION FOR SUMMARY JUDGMENT**</u>

*PUBLIC VERSION*

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................3

II.   STATEMENT OF UNDISPUTED FACTS ..........................................................4

    A.   The '835 Patent ..........................................................................................4

    B.   The Gundavaram Newsgroup Post ............................................................7

    C.   Google's AFC Systems ...............................................................................9

III.   LEGAL STANDARD..........................................................................................10

IV.   ARGUMENT........................................................................................................11

    A.   The Gundavaram Newsgroup Post Anticipates All of the Asserted Claims
       of the '835 Patent. .....................................................................................11

        1.   Gundavaram's newsgroup post is a printed publication that is prior
           art to the '835 patent. .....................................................................11

        2.   Suffolk does not contest that claims 1 and 7-9 of the '835 patent
           are anticipated by the Gundavaram newsgroup post. ......................17

        3.   Gundavaram's newsgroup post anticipates claim 2 because the
           code supplies certain files only if the identification signal matches
           a predetermined identification signal..............................................19

        4.   Gundavaram's newsgroup post anticipates claim 6 because it
           generates the supplied file............................................................22

    B.   Google's AFC Systems Do Not Infringe the '835 Patent......................24

        1.   AFC does not compare the received URL with a list of pre-
           determined URLs. .........................................................................24

        2.   Under Google's proposed construction for "file," Suffolk concedes
           that AFC does not literally infringe, and fails to raise an issue of
           fact that Google infringes under the doctrine of equivalents.....................29

V.   CONCLUSION.....................................................................................................30

## I.    **INTRODUCTION**

U.S. Patent No. 6,081,835 claims a method of controlling access to and generating files based on the address of the requesting file.  Pretrial proceedings give rise to two issues warranting summary judgment.  First, all of the asserted claims (claims 1, 2, and 6-9) can be dismissed as anticipated by a 1995 newsgroup post written by Shishir Gundavaram.  Second, the infringement allegations can be dismissed because Google's AdSense for Content ("AFC") service does not satisfy the claim language either literally or under the doctrine of equivalents.

On the issue of invalidity, Google's expert G. Mark Hardy has established that the Gundavaram newsgroup post anticipates every asserted claim of the '835 patent.  Suffolk's expert Dr. Rhyne offered no rebuttal in his report or at deposition that asserted claims 1 and 7-9 are valid over the Gundavaram newsgroup post.  As to the two remaining asserted claims, Dr. Rhyne admitted at deposition that they were also anticipated by the Gundavaram newsgroup post.  Thus, the only remaining issue is whether or not the Gundavaram newsgroup post qualifies as a prior art publication.  On that point, Suffolk fails to raise any genuine issue of material fact.  The newsgroup post reflects a publication date, drew subsequent public commentary from at least six other people, and the author has testified regarding its authenticity and date of publication.  Applying Federal Circuit authority to this set of facts, summary judgment of anticipation is appropriate.

Google has identified a number of non-infringement arguments involving issues of fact that Suffolk disputes.  These issues will be presented at trial should one become necessary.  But Google has also identified non-infringement arguments for which there are no triable issues of fact, and are therefore appropriate for summary judgment.  First, AFC does not compare the "received identification signal" to "predetermined identification signals," as required by independent claim 1.  Suffolk acknowledges, as it must, that AFC modifies the received

identification signal prior to any comparison. These modifications are transformative in a way that is directly relevant to the scope of the patent claims. Thus, AFC cannot literally infringe claim 1. Furthermore, Suffolk cannot rely on the doctrine of equivalents because it surrendered during prosecution the very claim scope it now seeks to regain by way of its equivalence theory.

Second, the Court should grant summary judgment of non-infringement if it adopts Google's proposed construction for the term "file." Suffolk concedes as much with respect to literal infringement, and its theory under the doctrine of equivalents suffers from fatal legal flaws.

For all these reasons, Suffolk's claims should be summarily dismissed.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The '835 Patent

1.      The '835 patent resulted from a project at British Telecommunications (BT). BT determined that its own servers were being used to serve BT's logo to a website critical of BT. *See* Declaration of Matthias A. Kamber In Support of Google's Motion for Summary Judgment ("Kamber Decl."), Ex. A at 8-9. The named inventors therefore "conceived of a method using software to assure that a server could decide whether to serve a file or not based upon the referring webpage's identity." *Id.* at 9.

2.      The '835 patent acknowledges that HTTP requests at the time included details about the referring webpage. 3:36-40[1] ("The present inventors have realized that the HTTP protocol provides that the URL of the HTML file which refers to any image or digitised sound file is included as a 'referrer' address when a request for a file is made to an internet server."); *see also* 4:63-66 ("In the HTTP protocol, the request for a file includes referrer details which is the URL of the HTML file from which the request originated."). The patent discloses using this

---

[1]  For purposes of this brief, citations to the '835 patent are to the column and line numbers. For example, column 4, lines 46-50 would be cited as 4:46-50. The patent itself is filed herewith as exhibit B to the Kamber declaration.

information to decide whether to serve a file. In particular, the specification proposes using the URL of the requesting webpage to decide whether or not to serve up the requested file: "Since the HTTP protocol provides for the transmission of the URL of the HTML file currently being interpreted by the browser, the server which receives the request for the image file can determine the origin of the request i.e. which is the originating server, and can thus decide whether access to the image file is allowed." 5:10-15.

     3.     The idea of looking at the referrer address to control file access is illustrated in steps S33 and S34 of Figure 3:



The referrer address is the address (i.e., URL) of the webpage requesting a file. "By interrogating the referrer address, a second server is able to control access to the requested files." 3:51-53; *see also* 4:66-5:1 ("In step S33 the server looks at this referrer address and decides what file to send to the browser using the referrer address in step S34.").

     4.     Figure 4 further explains step S34 by separating it into three sub-steps. 5:15-18 ("In FIG. 4 step S34 is shown in more detail by steps S34A, S34B and S34C.").



As with Figure 3, the accompanying description explains that file access control is based on the

referrer address.  5:18-26 ("In step S34A the server compares the referrer address with the

allowed addresses . . . .").

5.      In keeping with these disclosures, independent claim 1 of the '835 patent reads

(with element labels added for reference):

|  | "A method of operating a file server, said method comprising the steps of: |
|---|---|
| Element 1A | receiving a request for a file; |
| Element 1B | determining if the request includes a received identification signal identifying an originating file from which said request originated; |
| Element 1C | comparing any said received identification signal with one or more predetermined identification signals; and |
| Element 1D | deciding which file, if any, is to be supplied in dependence upon said determining and comparing steps, and if in the deciding step it is decided that a file is to be supplied, supplying said file." |

6.      Another idea underlying the '835 patent is the use of the referrer field to allow

"customisation of web pages depending on the route by which the web page is arrived at."  6:6-7.

This is a focus of Figure 5 of the patent, which corresponds to asserted claim 6.  With respect to

Figure 5, the specification explains that:

The server then looks at the referrer address which refers to the URL of the HTML file which is currently being displayed by the web page (step S46) and the server runs an application using the referrer address in step S54 and in step S55 the server generates a HTML file which is then sent in step S56 to the browser.

6:25-34. These steps are illustrated in the portion of Figure 5 reproduced here.



The patent explains that "since the server refers to the referrer field to determine which application to run, the HTML file sent to the browser can be customised in dependence upon the webpage from which the request for a new webpage was made." 6:34-38. To do so, "the server runs an application which takes in the referrer address and generates a new HTML file." 6:38-40.

**B.**   **The Gundavaram Newsgroup Post**

7.    Newsgroups are a discussion system on the internet where users can participate in specific discussions by making posts. According to the Supreme Court, newsgroups "serve groups of regular participants, but these postings may be read by others as well. There are thousands of such groups, each serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 851-52 (1997).

7

8.      On June 29, 1995, Shishir Gundavaram responded to a post by Marshall C. Yount entitled "How to tell which page called the script?" on the comp.infosystems.www.authoring.cgi newsgroup. Kamber Decl., Ex. C at 1. Every post responding to Yount's question lists a specific posting date in June or July 1995 with a time-stamp of 12:00 a.m. *See id.* at 1-5.

9.      Gundavaram suggested using the HTTP_Referer field to control file access. *Id.* at 1. He testified that he remembered writing his newsgroup post during the summer of 1995, *id.*, Ex. D at 26:9-24, and identified his unique code-writing style that he incorporated into the post. *Id.* at 45:23-46:18. Gundavaram also explained that the code was publicly available and that newsgroups were organized into folders so that anyone looking for posts on a particular subject could locate both his post and code. *Id.* at 31:10-20; 29:10-30:9. Numerous responses to Gundavaram's post discuss the use of HTTP_Referer to control file access. *Id.*, Ex. C at 1-4.

10.     Google's expert G. Mark Hardy opined that Gundavaram's post anticipates claim 1 of the '835 patent because it discloses receiving a file request that includes an HTTP_Referer address, assigns that address to a variable ("$referer = $ENV{'HTTP_REFERER'}"), compares that address to a list of allowed addresses (e.g., "if ($referer =~ /abc\.html/)"), and generates a response by way of a "print" statement (e.g., "print 'A link in abc.html called this document.'"). *Id.*, Ex. E, ¶¶ 180-183. Hardy also opined that Gundavaram's post anticipates claims 2, and 6-9 of the '835 patent. *Id.*, ¶¶ 185, 189-192.

11.     Suffolk's expert Dr. Rhyne does not disagree with Hardy's characterization of claim 1. *Id.*, Ex. F at 68:15-69:10. In fact, Dr. Rhyne, does not challenge Hardy's assertion that Gundavaram's post anticipates claims 1 and 7-9 of the '835 patent. *Id.* at 62:8-16; 63:7-14. Moreover, during his deposition, Dr. Rhyne agreed that his interpretation of claim 2 was overly restrictive and that the Gundavaram newsgroup post discloses supplying a file only if there is a match. *Id.* at 114:12-115:2; 64:10-14; 81:2-17.

12.     With respect to claim 6, Dr. Rhyne agrees that the print statements in Gundavaram's code qualify as a "file" under Suffolk's proposed construction of the term. *Id.* at 74:3-19.  Furthermore, both Gundavaram and Dr. Rhyne agree that the file output by Gundavaram's code incorporates the value of "$referer," which contains the value of the HTTP_Referer. *Id.*, Ex. D at 53:25-54:2 (Gundavaram); *id.*, Ex. F at 69:7-10 (Rhyne). Accordingly, Dr. Rhyne explicitly admitted that Gundavaram's code anticipates claim 6 under Google's proposed construction of "generating said supplied file." *Id.*, Ex. F at 100:23-101:6. Suffolk's proposed construction, however, requires that file generation occur "in dependence upon the originating file."  As discussed above, Suffolk agrees that the file output by Gundavaram's code is tailored to the HTTP_Referer (i.e., the address of the originating file), which Suffolk also agrees is an aspect of the originating file. *Id.*, Ex. G at 18 ("the address of the originating file" may be used as context for the originating file).

### C.     Google's AFC Systems

13.     In the context of the patent applied to web-based systems, the parties agree that the "received identification signal identifying an originating file" is the *address* (the URL) of the particular webpage making the request for a file. *Id.*, Ex. H, ¶ 168.  The parties also agree that the comparing step (1C) involves a comparison of that received address to a list of addresses. *Id.*, Ex. F at 348:22-349:9 (Rhyne).  Finally, the parties agree that the deciding step (1D) of claim 1 involves "selecting which file is going to be supplied based in dependence upon the determining and comparing steps which used the identification signal." *Id.* at 349:15-18.

14.     Google's AFC system receives a URL (identification signal), but then modifies that URL prior to the comparison step in a process known as "normalization." *Id.* at 309:14-310:3.  ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Suffolk admits that, at least with regard to one aspect of the normalization process,

this normalization process is one-way and changes the URL into something that is no longer

usable to identify a specific webpage. *See id.*, Ex. F at 347:14-16 (Rhyne).

     15.    The accused AFC systems then ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Suffolk admits that what is used by AFC for comparison in

Suffolk's accused analogue to step 1C is not the same representation of the URL that is received

in its accused analogue to step 1A. *Id.*, Ex. F at 318:11-15 (Rhyne).  Suffolk refers to this

admitted difference as "a mapping" or relation. *Id.*, Ex. H, ¶ 177 (Rhyne).

     16.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

## III.   **LEGAL STANDARD**

    Summary judgment is appropriate if "there is no genuine issue as to any material fact"

and "the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A

genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a motion for summary judgment is made, the opposing party has the burden of demonstrating a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quotation marks omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphases in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## IV.   ARGUMENT

### A.   The Gundavaram Newsgroup Post Anticipates All of the Asserted Claims of the '835 Patent.

The Gundavaram reference anticipates each asserted claim because it discloses all of their recited elements. *See Verdegaal Bros., Inc. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987). Summary judgment is appropriate because Suffolk fails to raise a genuine dispute that Gundavaram does not qualify as prior art, and Suffolk's expert concedes that Gundavaram anticipates the asserted claims.

#### 1.   Gundavaram's newsgroup post is a printed publication that is prior art to the '835 patent.

On June 29, 1995—many months before the April 4, 1996 U.K. filing date for the foreign application that led to the '835 patent—Marshall C. Yount made a posting entitled "How to tell which page called the script?" on the comp.infosystems.www.authoring.cgi newsgroup. He wrote:

I am a newbie at this CGI stuff, so this question might seem ridiculous (I did look in the FAQ and on some web pages). I have this script that will be called from one of 18 pages. Depending on which page it was called from, the output will be different. Is there any environment variable that will tell me this, or do I have to externally pass information to the script[?]

Kamber Decl., Ex. C at 1. A college student named Shishir Gundavaram replied by saying:

Look at the CGI environment variable HTTP_REFERER. In Perl, you can do something like this:

```perl
#!/usr/local/bin/perl

$referer = $ENV{'HTTP_REFERER'};

print "Content-type: text/plain", "\n\n";

if ($referer =~ /abc\.html/) {
        print "A link in abc.html called this document.", "\n";
} elsif ($referer =~ /efg\.html/) {
        print "A link in efg.html called this document.", "\n";
} else {
        print "A link in ", $referer, " called this document.", "\n";
}

exit(0);
```

*Id.* Google's expert explained that this code discloses receiving a file request that includes an HTTP_Referer address, assigning that address to a variable ("$referer = $ENV{'HTTP_REFERER'}"), comparing that address to a list of allowed addresses (e.g., "if ($referer =~ /abc\.html/)"), and generating a response by way of a "print" statement (e.g., "print 'A link in abc.html called this document.'"). *Id.*, Ex. E, ¶¶ 180-183.

The Gundavaram newsgroup post reflects that it was made on June 29, 1995. *Id.*, Ex. C at 1. Along those lines, Gundavaram remembered writing his post during the summer of 1995:

Q  Do you recall the date of the news post group that Mr. Kamber sent you?

A  It was -- yes.

Q  What was the date?

A  I don't remember the exact date, but it was in the summer of '95.

12

Q   You stated, I think you testified earlier, you received your degree from Boston University in 1996; is that correct?
A   Yes, that's correct.
Q   So it's fair to say that you were a student at Boston University in the summer of 1995 when you made these posts?
A   Yes, that's correct.
Q   Why were you posting?
A   I wanted to help people.

*Id.*, Ex. D at 26:9-24.

Furthermore, Gundavaram identified his unique code-writing style that he incorporated

into the post:

Q   This is code that you wrote.
A   Yes I did.
Q   Do you recall writing that code?
A   I don't recall exactly writing that code, no.  I have certainly written code like that, and there's certainly -- as I mentioned before, there's stylistic things in that code that indicate the way I wrote code around that time frame.
Q   Can you point me to those stylistic things you're talking about?
A   Sure.  What I would do is, if you look several lines down, you would see at the end of the lines there is a backslash N.
Q   I do see that.
A   And those are all separately quoted, meaning quote, backslash N, quote.  And I was one of the – I was in the minority on how I wrote that, and that's how I can easily tell that that's –
Q   So others at that time would not use that notation?
A   No, they would not.

*Id.* at 45:23-46:18.

Gundavaram then explained that the code was both publicly available and organized in a

manner such that anyone interested in learning "which page called the script," as the thread was

titled, could locate both his post and the code:

Q   Was this use -- user group, was it publicly available?
A   Yes, it was.
Q   Who would it be available to then, anyone with a computer?
A   It was primarily -- these Usenet Newsgroups were primarily syndicated across to almost all of the universities across the U.S. and around the world, and, certainly, certain institutions that could set up feeds to receive these Usenet Groups as well.  So there was a lot of corporations, but primarily schools and colleges.

13

*Id.* at 31:10-20.  In fact, anybody looking for information on a particular subject could easily find

the associated newsgroup because the newsgroups were organized into folders for ease of access:

> Q   At the top of the page, there's the words
> "comp.infosystems.www.authoring.cgi."  What does that signify?
> A   That's the name of the Newsgroup.  And basically sort of like a
> duodecimal [sic] system, you know, with libraries, they -- the people who created
> these Usenet Newsgroups, they basically had these different categories from --
> that they dedicated to different topics.  And so this -- obviously, the comp stands
> for computers, and then CGI on the end of it stands for common gateway
> interface.
> Q   I'm sorry.  Say that again.
> A   Common gateway interface.
> Q   So that -- the title of the Newsgroup; is that correct?
> A   That's the title of the Newsgroup.
> Q   There's some sort of hierarchy; so comp is the highest level, info
> systems is the next level?
> A   That's correct.
> Q   And then all the way down to CGI is the lowest level?
> A   That's correct.
> Q   Sort of like a folder system?
> A   Absolutely.

*Id.* at 29:10-30:9.[2]

The public nature and widespread availability of Gundavaram's post on the internet is

further underscored by the responses it elicited.  The remainder of the archived post reflects at

least six responses, made over the course of the ensuing week, that discuss the efficacy of

Gundavaram's use of HTTP_Referer to control access to files.  *Id.*, Ex. C at 1-4.  Specifically,

Michael Kelsey added to the conversation by providing the hypertext transfer protocol

specifications for HTTP_Referer, *id.* at 2-3; Jonathan Bellack suggested trying both the stand-

---

[2]   Suffolk's expert, Dr. Rhyne, also used newsgroups in 1995 and 1996:

> Q.   In the 1995/1996 period, did you ever use newsgroups?
> A.   I'm sure that I did.  I don't have any specific recollection of which
> newsgroups I may or may not have been a subscriber to other than there is one
> called Rec.Arts.Funny, which was a joke newsgroup.  I actually contributed a joke
> to that once, so.

Kamber Decl., Ex. F at 55:13-56:17.

alone REFERER field and the HTTP_Referer field, *id.* at 3; Elf Sternberg suggested using a

GET statement instead of HTTP_Referer, *id.* at 1-2; Trevor Schadt suggested using hidden

variables, *id.* at 3-4; and Dave Barberi agreed with Gundavaram and provided further sample

code that incorporated both HTTP_Referer and Referer_URL, *id.* at 4.

"Where no facts are in dispute, the question of whether a reference represents a 'printed

publication' is a question of law." *In re Klopfenstein*, 380 F.3d 1345, 1347 (Fed. Cir. 2004).

Because Gundavaram's post was freely accessible to members of the public interested in the art,

it qualifies as a prior art printed publication under 35 U.S.C. § 102. *See id.* at 1347-50 (slides

displayed for three days were printed publications because their entire purpose was public

communication of the relevant information); *Voter Verified, Inc. v. Premier Election Solutions,*

*Inc.*, 698 F.3d 1374, 1379-81 (Fed. Cir. 2012) (articles on a publicly available website were

printed publications); *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir.

2006) (figures in a Canadian patent application constituted a printed publication). The United

States Patent and Trademark Office agrees—it treated contemporaneous newsgroup postings by

both Samudrala and O'Callaghan as prior art when it recently granted reexamination of the '835

patent. Kamber Decl., Ex. P, ¶¶ 4, 22-29.

As in *Klopfenstein*, Gundavaram's June 1995 post was on display to the public months, if

not years, before the earliest effective filing date for the '835 patent. The posting, available on

an internet newsgroup organized into folders, was seen by a wide variety of viewers who not

only discussed the merits of Gundavaram's approach, but also suggested alternative solutions to

the problem posed. *See Mass. Inst. of Tech. v. Ab Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985)

(paper disseminated without restriction to six persons was printed publication).[3] Indeed,

---

[3] Gundavaram's post would qualify as a printed publication even if nobody had responded to the
post because there is no requirement that anyone ever actually access a reference; it is sufficient

Gundavaram's post elicited thoughtful responsive posts up to five days later, almost twice as long as the three-day display found sufficient in *Klopfenstein*. Not only that, the "reference was shown with no stated expectation that the information would not be copied or reproduced by those viewing it." *Klopfenstein*, 380 F.3d at 1350. Instead, Gundavaram testified that he wrote and publicly posted the code in order to help people. Kamber Decl., Ex. D at 26:9-24; *see also id.* at 25:5-11 (Gundavaram testifying that he wrote hundreds of such posts). Gundavaram's post is therefore a printed publication under Federal Circuit authority.

District courts have granted summary judgment of anticipation when addressing essentially identical fact patterns. *See, e.g.*, *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 632 F. Supp. 2d 23, 36-37 (D.D.C. 2009), *vacated on other grounds* 606 F.3d 1338, 1349 (Fed. Cir. 2010). Specifically, in *Dow Jones*, the court granted summary judgment based on prior art computer software because the programmer's oral testimony that he posted the source code on newsgroups before the priority date and that the posting generated responses sufficiently corroborated the posting as a printed publication. *Id.*; *see also Netscape Commc'ns Corp. v. ValueClick, Inc.*, 707 F. Supp. 2d 640, 647-48 (E.D. Va. 2010) (denying motion that an internet posting was not prior art because it was supported by testimony and the face of the document).

The fact that both Yount's question and Gundavaram's response each have the same time-stamp—12:00 am on June 29, 1995—fails to give rise to a genuine dispute. A simple review of the postings in the thread demonstrates that the archival system stored only the date of the post and not the time. *See* Kamber Decl., Ex. C at 1-5 (listing various postings on different days). In any event, independent of the archival system's limitations, Gundavaram's testimony

---

that one be able to do so. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988) ("If accessibility is proved, there is no requirement to show that particular members of the public actually received the information.").

that the code was published in the summer of 1995 is corroborated by the face of the code, which lists the date of publication, as well as the dates of the subsequent responses. Publication of Gundavaram's code many months before the earliest possible priority date is determinative. The Federal Circuit does not require "evidence establishing a *specific* date" since "an approximation found in the affidavits such as 'toward the beginning of the month of December, 1977' works no injustice here because the critical date, February 27, 1978, is some two and one half months later." *In re Hall*, 781 F.2d 899, 899-900 (Fed. Cir. 1986) (emphasis in original). Similarly here, the exact time when Gundavaram made his post on June 29, 1995, is not material—the post was made well before the earliest possible priority date (April 4, 1996). *See ArcelorMittal France v. AK Steel Corp.*, 811 F. Supp. 2d 960, 966 n.3 (D. Del. 2011) ("Defendants do not have to prove that the Bano article was available to the public *on* a specific date. Rather, they must prove, by clear and convincing evidence, that the Bano article was publicly available *prior* to the critical date of the '805 patent" (emphases in original)), *rev'd on other grounds* 700 F.3d 1314 (Fed. Cir. 2012). Thus, Gundavaram's post is a printed publication that is prior art to the '835 patent.

**2.      Suffolk does not contest that claims 1 and 7-9 of the '835 patent are anticipated by the Gundavaram newsgroup post.**

Google disclosed the Gundavaram newsgroup post in its September 26, 2012 invalidity contentions, and Google's expert G. Mark Hardy later opined that Gundavaram anticipated all of the asserted claims. Kamber Decl., Ex. E, ¶¶ 180-185, 189-192. In rebuttal, Suffolk's technical expert, Dr. Rhyne, did not challenge the assertion that claims 1 and 7-9 of the '835 patent are anticipated by Gundavaram's post. During his deposition, Dr. Rhyne was specifically asked: "In your opinion, assuming it is admissible prior art, then you would agree that the Gundavaram newsgroup post anticipates Claims 1, 5, 7, 8 and 9, correct?" Dr. Rhyne responded: "I haven't offered an opinion one way or the other and I don't have an opinion one way or the other." *Id.*,

Ex. F at 62:8-16. Dr. Rhyne also does not intend to offer any opinion that claims 1 and 7-9 are

not anticipated by Gundavaram's post. *Id.* at 63:7-14 ("At this point I don't anticipate testifying

outside what is in my report on the Gundavaram newsgroup posting."). In effect, Dr. Rhyne—on

behalf of Suffolk—concedes that claims 1 and 7-9 of the '835 patent are anticipated by the

Gundavaram reference.

Dr. Rhyne concedes anticipation of claims 1 and 7-9 because the Gundavaram newsgroup

post clearly discloses all of the claimed elements. First, it discloses a file server receiving a

request for a file: "Look at the CGI environment variable HTTP_REFERER." *Id.*, Ex. E, ¶ 180.

Second, by capturing the identification signal of the originating file sent by the browser into the

variable named $referer, the code determines whether the request includes an identification

signal identifying an originating file. *Id.*, ¶ 181; *see also id.*, Ex. D at 49:10-24 (Gundavaram

testimony). Third, the code compares the received identification signal with one or more

predetermined identification signals, i.e., "if ($referer =~ /abc\.html/)". *Id.*, Ex. E, ¶ 182; *see

also id.*, Ex. D at 51:16-53:15 (Gundavaram testimony). Fourth, the code decides which file, if

any, is to be supplied in dependence upon the determining and comparing steps, and if in the

deciding step it is decided that a file is to be supplied, supplies the file. Specifically, it supplies

the file by printing, for example, "A link in ', $referer, ' called this document.', '\n'." *Id.*, Ex. E,

¶ 183; *see also id.*, Ex. D at 51:19-23 (Gundavaram testimony) ("It's basically checking to see if

the originating URL is abc.html, and then it would print a link in abc.html called this document.

If the originating URL contains efg.html, then it would print out a link in efg.html called this

document.").[4] Suffolk's technical expert agrees with this characterization. *Id.*, Ex. F at 68:15-

---

[4] As discussed below, Dr. Rhyne agrees that the print statement returned by Gundavaram's code
is a "file" under Suffolk's construction for the term. To the extent the Court adopts Google's
proposed construction for "file," Google's systems do not infringe the '835 patent, as also
discussed below.

69:10 ("Basically, it uses this HTTP underscore referrer value to compare to two sets of possible comparison fields, one of them is ABC, the other one is EFG. . . . So you will either get the A link in ABC if you get a match with ABC.HTML or you will get a link in EFG.HTML if you get a match with EFG.HTML."). Thus, Gundavaram anticipates claim 1 of the '835 patent.

The Gundavaram post also anticipates claims 7-9. It anticipates claim 7 by disclosing using HTTP_REFERER; by definition, the variable conforms to the hypertext transfer protocol. *Id.*, Ex. E, ¶ 190. It anticipates claim 8 because, in accordance with the conventional use of HTTP, the HTTP_REFERER header field contains a universal resource location from which a request originated. *Id.*, ¶ 191. And it anticipates claim 9 because it relates to a method of using standard internet protocols, including HTML and HTTP, to serve up files on the World Wide Web. *Id.*, ¶ 192.

> **3.    Gundavaram's newsgroup post anticipates claim 2 because the code supplies certain files only if the identification signal matches a predetermined identification signal.**

In his report, Dr. Rhyne's sole reason for disputing that the Gundavaram newsgroup post anticipated claim 2 was that "*information* is provided regardless of what the HTTP_REFERER value is." *Id.*, Ex. J, ¶ 103 (emphasis added). But the plain language of dependent claim 2 requires that "the said supplied *file* is supplied only if any said identification signal matches a said predetermined identification signal." 7:43-45 (emphasis added.) There is no prohibition on the provision of information. In light of this, Dr. Rhyne conceded that his interpretation of claim 2 was overly restrictive:

> Q.  And here again, you have this reference to the information being provided regardless of the -- what the HTTP referrer value is. Do you see that?
> A.  I do.
> Q.  And that's the same issue that we talked about with respect to the Gundavaram reference, correct?
> A.  I think that it's the same flaw that we dealt with in my previous statement about the limitation of Claim 2 requiring that no information is to be supplied is

present in Paragraph 110.  But give me a minute, let me just review what
Samudrala said.
Q.   Sure.
A.   Okay.  Yeah, I think that that's an overly restricted interpretation of
limitations of Claim 2, as I understand it here today.

Kamber Decl., Ex. F at 114:12-115:2; *see also id.* at 64:10-14 ("Q.   Okay.  Is it your

understanding that Claim 2 requires that no information is to be supplied if there is no match to a

predetermined value?  A.   I don't think that is exactly the right way to view the total limitation

of Claim 2.").  Dr. Rhyne's concession that claim 2 is anticipated by Samudrala applies equally

as strongly to the Gundavaram reference since Dr. Rhyne's argument in both cases is *identical*.

*Compare id.*, Ex. J, ¶ 110 *with id.*, ¶ 103 (repeating argument that "information is provided

regardless of what the HTTP_REFERER value is").

Applying the proper interpretation of the limitations of claim 2, there is no genuine

dispute of material fact that Gundavaram's newsgroup post anticipates claim 2.  Google's expert

explained that Gundavaram's code—"if ($referer =~ /abc\.html/) {print 'A link in abc.html

called this document.', '\n';}"—is program logic that matches the received identification signal

($referer) to a predetermined signal (abc.html), and supplies the file ('A link in abc.html called

this document.') only if there is a match.  *Id.*, Ex. E, ¶ 185.  In other words, the output is

generated *only if* the identification signal matches "abc.html" or "efg.html."  Dr. Rhyne agreed:

Q.   Well, let me ask you a question.  This script only returns the print statement
"A link in ABC.HTML called this document" if there's a match between the
HTTP referrer and this "if" statement, correct?
A.   Yes.
Q.   It only supplies it in that particular circumstance, correct?
A.   That's -- I already answered that.
Q.   Okay.  And it only returns the print statement "A link in EFG.HTML called
this document" if the referrer matches in this "else if" statement, correct?
A.   Well, there is two "else if" statements, but I think you mean the second one
that's comparing to EFG.HTML, and the answer to that is yes.

*Id.*, Ex. F at 81:2-17. In other words, Dr. Rhyne agrees that a particular print statement, or file, is returned only if the identification signal of the requesting file matches "abc.html." He further agrees that a different print statement is returned only if the requesting file matches "efg.html." Thus, there being no dispute that Gundavaram's code supplies particular files only if the HTTP_Referer field matches particular predetermined values, summary judgment of anticipation of claim 2 is appropriate.

In a final act of desperation, nineteen hours before the filing deadline for the instant summary judgment memorandum, Dr. Rhyne sought to withdraw his admissions regarding claim 2 through an errata sheet. *See id.*, Ex. Q at 1 (errata sheet seeking, inter alia, to delete admissions such as "I think that my statement in the last sentence of paragraph 103 is overly narrow."). As this Court has previously stated, if the errata sheet "makes substantive changes, not technical or typographical changes" to deposition testimony, then "[a]ltering deposition testimony in this manner is not a permissible use of errata sheets." *Sun Yung Lee v. Zom Clarendon, L.P.*, 689 F. Supp. 2d 814, 816 n.3 (E.D. Va. 2010). In fact, this Court made clear that a "deposition is not a take home exam. The errata sheet 'clarifications' in this case are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade." *Id.* (quotation marks omitted); *see also Touchcom, Inc. v. Bereskin & Parr*, 790 F. Supp. 2d 435, 465 (E.D. Va. 2011) (the purpose of an errata sheet is "not to modify what the deponent said for tactical reasons or to reflect what he wishes that he had said." (internal quotation marks and alteration omitted)); *E.I. du Pont de Nemours & Co.*, 277 F.R.D. 286, 297 (E.D. Va. 2011). Dr. Rhyne's concessions regarding claim 2—his failing grade—are made abundantly clear by his attempt to withdraw his testimony on the eve of summary judgment.

**4.    Gundavaram's newsgroup post anticipates claim 6 because it generates the supplied file.**

Claim 6 reads: "A method as in claim 1 wherein said deciding step further comprises generating said supplied file." 8:1-2. The Gundavaram newsgroup post anticipates claim 6 under both parties' proposed constructions for the phrase "generating said supplied file." Not only is Gundavaram's file generated in dependence upon the "received identification signal," as Google proposes, it also depends upon the "originating file," as Suffolk proposes.

To begin, Dr. Rhyne concedes that the print statements in Gundavaram's code qualify as a "file" under Suffolk's proposed construction:

> Q. Please listen to the question. Is a print statement a collection of information that is treated as a unit?
> A. I certainly think that that is one way of interpreting the print statement as a link -- a set of characters.
> Q. So "print statement" meets Suffolk's definition of "file" in this case?
> A. I can understand why someone would take that position.
> Q. Well, it's a yes or no question.
> A. It's actually --
> Q. I'm asking for your position, Dr. Rhyne. Is it your position that a print statement is or is not a file under Suffolk's construction?
> A. I think a print statement as the one shown in Gundavaram meet that construction.

Kamber Decl., Ex. F at 74:3-19.[5]

The parties disagree about the proper interpretation of claim 6. Google contends that the supplied file must be generated "in dependence upon the received identification signal"—in other words, based on the address or identity of the requesting file. Both Gundavaram and Dr. Rhyne agree that the file generated by Gundavaram's code incorporates the value of "$referer,"

---

[5]   Contrary to Dr. Rhyne's bald assertion, nowhere does Google's expert "admit that no file is generated by the Gundavaram suggestion." Kamber Decl., Ex. J, ¶ 104. In the avoidance of doubt, Google's expert further clarified his opinion at his deposition: "Using the claim construction of file as a collection of information that is treated as a unit, decode, print a link in dollar referrer called This Document is creating a file, it's generating a file, because it didn't exist before, and it's using new values. And so that would anticipate it." *Id.*, Ex. K at 74:4-9.

which contains the value of the HTTP_Referer—the received identification signal identifying the requested file. *Id.*, Ex. D at 53:25-54:2 (Gundavaram testimony) ("It basically sends just back a text that says a link in, and then it fills in the value of the original URL, the referer, called this document."); *id.*, Ex. F at 69:7-10 (Rhyne testimony) ("However, there is an else. And in the last line, if neither of those match, then you will get a link in some other referrer, something else, call this document."). Accordingly, Dr. Rhyne admits that Gundavaram's code anticipates claim 6 under Google's proposed construction:

> Q. Fair enough. Let me just ask this simple question: Does Gundavaram generate a file based on just the identity of the -- or based on the identification signal of the originating file?
> A. Yes.
> Q. It does?
> A. Only that, that's correct. That's part of the -- as I pointed out here, the if/else if/else logic.

*Id.*, Ex. F at 100:23-101:6.

Gundavaram's code also anticipates claim 6 under Suffolk's proposed construction, which requires that file generation occur "in dependence upon the originating file." As specified in Suffolk's responsive claim construction brief, one aspect of the originating file is the address of the originating file. *Id.*, Ex. G at 18 ("Thus, consistent with the specification, Suffolk's construction permits a file to be generated based upon information about the web page (*whether from the address of the originating file used as context for the web page*, the content of the originating file, or keywords derived from either or both)" (emphasis added)). As discussed above, because the output of Gundavaram's script is undisputedly tailored in dependence upon the value of the HTTP_Referer field—the address of the originating file—it anticipates claim 6 under Suffolk's construction. In fact, this behavior mimics an embodiment specified in the '835 patent specification. After specifying that referrer details "is the URL of the HTML file," the specification goes on to state:

> In addition to the possibility of controlling access to image or sound, or other high bandwidth files, the referrer details [which is the URL of the HTML file] transmitted with the file request may inform the server of the web page from which a file request is being made. Thus, if a HTML file is requested from a web page, the server is able to *identify from which web page the HTML file request is made* and customise the HTML file accordingly.

3:62-4:10 (emphasis added). Because Gundavaram's script customizes its file output based on the HTTP_Referer field, which stores the identity of the originating file, the script generates "in dependence upon the originating file."

In sum, regardless of whether the Court applies Suffolk's or Google's proposed construction for "generating said supplied file," the Gundavaram newsgroup post anticipates claim 6. All asserted claims of the '835 patent are therefore invalidated by the Gundavaram post.

**B.     Google's AFC Systems Do Not Infringe the '835 Patent.**

Suffolk accuses Google's AFC systems, including AFC, AdSense for Mobile Content, AdSense for Video, and AdSense for Newsletters,[6] of infringing claims 1, 2, and 6-9 of the '835 patent. By way of discovery, Google has identified a number of non-infringement defenses. While some of those defenses depend on disputed questions of fact for trial, at least two do not. As to those defenses, the Court should rule that, as a matter of law, the AFC systems do not infringe the asserted claims of the '835 patent.

**1.     AFC does not compare the received URL with a list of pre-determined URLs.**

Element 1C of independent claim 1 requires "comparing any said received identification signal with one or more predetermined identification signals." 7:37-38. AFC instead compares "normalized URLs," which prior to the comparison step are transformed into something meaningfully different from the "said received identification signal" of element 1C. Suffolk's

---

[6] For the purposes of its infringement arguments, Suffolk does not rely on any of the unique features of the Mobile, Video, or Newsletters products. Accordingly, Google's non-infringement arguments apply equally across all accused AFC products.

expert makes a disguised equivalence argument, suggesting that there must be infringement

because "a mapping" exists between the received and normalized URLs.  Kamber Decl., Ex. H,

¶ 177.  But Suffolk is estopped by the '835 patent's prosecution history from making up for this

material difference through application of the doctrine of equivalents.  The difference concerns

precisely the claim scope that the patentee abandoned to obtain the asserted patent claims.

Summary judgment of non-infringement is therefore appropriate with regard to claim 1, as well

as the asserted dependent claims.

    Suffolk accuses the functionality of AFC that receives the URL of a webpage that is

requesting ads (a received identification signal), and



As Suffolk acknowledges, the ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ is not the URL received in the ad request, but rather a modified version

of it.  *Id.*, Ex. H, ¶ 175.

    Claim 1 uses the phrase "received identification signal" in the "determining" step (1B),

and refers to it again in the "comparing" step (1C).  When discussing element 1B, Dr. Rhyne

identifies the URL contained in the ad request as the "received identification signal."  *Id.*, Ex. F

at 305:14-307:3.  It follows from the claim language that the "said received identification signal"

of element 1C must be the same received URL.  *See also* 6:65-67 ("A comparator 304 then

compares *the identified* identification signal in the input file request . . .") (emphasis added).

Indeed, the patent does not disclose any modifications to the received URL of step 1B before it is

subject to the comparison step, 1C.

    In contrast, in AFC, after receipt, and before any comparison, Google's system modifies

the received URL.  Kamber Decl., Ex. F at 309:14-310:3 (Rhyne) ("▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████ "). This process is

called "normalization." ██████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ Suffolk does not

dispute the particulars of the normalization process.[9] Nor does it dispute that normalized URLs

are used in the accused comparison step.

Crucially, a number of the normalization steps done to the received URL can destroy its

ability to identify the webpage from which a request originated.  For instance ████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████  If the normalized URL can no longer resolve back to the

particular webpage that was the source of the ad request, then it cannot be "said received

identification signal" identifying an originating file.

Suffolk glosses over the transformative normalizations that occur in Google's accused

systems and alleges that "normalized URLs" are the "said received identification signals" and

---



[7] Kamber Decl., Ex. I at 104:10-14 (Walker).

[8] Kamber Decl., Ex. I at 105:19-107:10 (Walker) ("

").

[9] At his deposition, Suffolk's expert Dr. Rhyne admitted that he did not analyze Google's source
code concerning normalization, but did rely on the testimony of Google's engineers.  Kamber
Decl., Ex. F at 318:23-319:12, 315:2-6.

the "predetermined identification signals" of Element 1C. *Id.*, Ex. H, ¶ 175. Suffolk further

alleges that because the "normalized URL" is "'a mapping' of the received URL and is 'related

to it,'" a comparison of normalized URLs and pre-determined normalized URLs literally

infringes claim 1, or alternatively infringes as an equivalent. *Id.*, ¶ 177. Yet claim 1 clearly

requires that "*said* received identification signal" be compared, not something else that is

"mapped" or "related to" said received identification signal.[10] And Dr. Rhyne admits that,

strictly speaking, the ███████████████████████████ is not the received

URL. *Id.*, Ex. F at 318:11-15 ("The AFC system does not compare the representation of the

URL from the HTTP get request to a similar representation of the URL in -- of the previously

crawled pages, correct? A. Yes."). Thus, there can be no literal infringement of Element 1C by

Google's AFC systems.

When Dr. Rhyne speaks of "a mapping" between the received and normalized URLs, he

is actually arguing equivalence. But because the '835 patent was narrowed during prosecution,

there can be no infringement of Element 1C by AFC under the doctrine of equivalents. *Festo*

*Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003) (patentee

is presumed to have surrendered all territory between narrowing amendments and the original

proposed claims). Specifically, the '835 patent was narrowed to overcome the Graber reference.

The originally filed claim was directed at "identifying the *origin* of the file request." Kamber

Decl., Ex. L (March 11, 1997 Application) (emphasis added). That claim was rejected based on

---

[10]   The "mapping" of normalization can be irreversibly transformative. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

U.S. Patent No. 5,712,979 to Graber. *See id.*, Ex. M at 2-5 (March 29, 1999 Office Action).

Graber disclosed sending co-marketer ID information, which the Examiner interpreted as

information "identifying the origin of the file request." *See id.* BT therefore canceled the claim

and added a new one more narrowly drawn to "identifying *an originating file* from which said

request originated." *Id.*, Ex. N at 2-5 (July 28, 1999 Amendment) (emphasis added). This is the

claim that issued as claim 1 of the '835 patent. By amending to secure issuance, Suffolk

abandoned claim language that the examiner interpreted to cover broad identifying information

of an origin (e.g., a site ID or party ID that could map to many individual webpages), in favor of

the narrower language "identifying an originating file" (e.g., one specific webpage). Google's

"normalized URL" is nothing more than the broad origin-identifying information disclosed in

Graber over which the patentee had to narrow its proposed claims.

Suffolk has offered nothing to rebut the *Festo* presumption, and therefore "prosecution

history estoppel bars the patentee from relying on the doctrine of equivalents for the accused

element" as a matter of law. *Festo Corp.*, 344 F.3d at 1367. In any event, like a server ID or the

co-marketer party ID of the Graber prior art, a normalized URL can map to many individual

webpages.[11] As such, a normalized URL may not identify a specific originating file, and could

only be infringing under the doctrine of equivalents by reclaiming surrendered claim scope. This

is not allowed under *Festo*. Furthermore, Suffolk fails to raise a genuine issue of material fact

merely by pointing to "a mapping" between what AFC actually does and what is claimed

regarding the comparing step—particularly not with a mapping that attempts to recapture

surrendered claim scope. Because Suffolk's infringement arguments, regardless of their label,

depend on an equivalents theory, they should be disposed of on summary judgment.

---

[11] Kamber Decl., Ex. I at 107:1-7 (Walker) (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ").

**2.    Under Google's proposed construction for "file," Suffolk concedes that AFC does not literally infringe, and fails to raise an issue of fact that Google infringes under the doctrine of equivalents.**

Each asserted claim requires "receiving a request for a file" and "deciding which file, if any, is to be returned . . . ." Because AFC ███████████████████████████

██████, there is no literal infringement under Google's proposed construction of "file."

Statement of Undisputed Facts ¶ 16. ████████████████████████████



██████ Suffolk's expert agrees that there would be no literal infringement under Google's

proposed definition of "file," *Id.* at 270:8-16 ("I think I have to invoke the doctrine of

equivalence to even get to the file server that performs the method of Claim 1 under Google's

proposed construction."). Thus, if the Court adopts Google's proposal, summary judgment of no

literal infringement as to all asserted claims is warranted.

Applying the same construction, Suffolk's doctrine of equivalents theory also fails as a

matter of law. There are at least two fatal problems with Suffolk's doctrine of equivalents

analysis. First, Dr. Rhyne does not actually apply the legal test for equivalence, instead merely

offering his conclusory opinion that the identified difference is insubstantial. And Dr. Rhyne's

purported support for his opinion contradicts itself; his own arguments concerning performance

degradation tend to suggest that the identified difference between storing to disk or not would in

fact be substantial. *See id.*, Ex. H, ¶¶ 133-134 (████████████████████████

██████████████████████); *id.*, Ex. F at 276:3-277:18 █████████████).

Second, Suffolk's theory impermissibly vitiates the claim element in question. If this Court adopts Google's construction of the term file, it will have decided that a person of ordinary skill would interpret claim 1 to require storage of files at an address. But Dr. Rhyne opines that *not* storing addressed files is an equivalent. *Id.*, Ex. F at 273:16-277:25 ("Q. In providing your opinion on the doctrine of equivalence you do, in fact, leave out the step of storage, correct? A. I have said that leaving it out is not a substantial difference."). "Such an assertion amounts to an argument that the absence of a feature is equivalent to its presence, which is a negation of the doctrine of equivalents." *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) (rejecting a reading that "improperly vitiates claim language by allowing the exact opposite of what is required").[12]

In sum, if the Court adopts Google's proposed construction and requires that "file" as used in the patent requires storage at an address, then summary judgment of no literal infringement is required. Furthermore, because Suffolk cannot, as a matter of law, raise a triable issue that not storing at an address is equivalent to storing at an address, summary judgment of no infringement under the doctrine of equivalents is appropriate. *See Mirror Worlds*, 692 F.3d at 1358 (disapproving of conclusion that lack of a cursor was equivalent to having a cursor, despite expert argument that a cursor was unnecessary).

## V. CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court grant summary judgment in favor of Google on both invalidity and non-infringement.

DATED: February 1, 2013                 */s/ Stephen E. Noona*

---

[12] ███████████████████████████████████████
███████████████████████████████████████████
██████. Under this improper formulation, the only system that would escape equivalence is one that needed to store files as a technical matter, but in fact didn't (i.e. a broken system).

Stephen E. Noona
Virginia State Bar No. 25367
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169
senoona@kaufcan.com

Robert A. Van Nest (pro hac vice)
Christa Anderson (pro hac vice)
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
rvannest@kvn.com
canderson@kvn.com

*Attorneys for Defendant Google Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2013, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig C. Reilly Esq.
LAW OFFICE OF CRAIG C. REILLY
111 Oronoco Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-2604
craig.reilly@ccreillylaw.com

Roderick G. Dorman (pro hac vice)
Jeanne E. Irving (pro hac vice)
Alan P. Block (pro hac vice)
Jeffrey Huang (pro hac vice)
MCKOOL SMITH HENNIGAN P.C.
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234
rdorman@mckoolsmithhennigan.com
jirving@mckoolsmithhennigan.com
ablock@mckoolsmithhennigan.com
jhuang@mckoolsmithhennigan.com

Douglas A. Cawley (pro hac vice)
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
dcawley@mckoolsmithhennigan.com
acurry@mckoolsmithhennigan.com

*Counsel for Plaintiff Suffolk Technologies, LLC*

                                         /s/ Stephen E. Noona
                                         Stephen E. Noona
                                         Virginia State Bar No. 25367
                                         KAUFMAN & CANOLES, P.C.
                                         150 West Main Street, Suite 2100
                                         Norfolk, VA 23510
                                         Telephone: (757) 624-3000
                                         Facsimile: (757) 624-3169
                                         senoona@kaufcan.com